**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------x

In re: **NOT FOR PUBLICATION**

ELMWOOD VENTURES LLC
d/b/a BUDDHA-BAR NEW YORK,

Chapter 7

Case No. 25-10932 (MG)

Debtor.

---------------------------------------------------------------------x

# MEMORANDUM AND ORDER GRANTING THE JOINT MOTION FOR CONTEMPT AND SANCTIONS

***A P P E A R A N C E S:***

JAMES M. MCDONALD
United States Attorney for the Southern District of New York
*Attorney for the United States*
By: Carly Weinreb, Esq.

TARTER KRINSKY & DROGIN LLP
*Counsel to the Chapter 7 Trustee*
1350 Broadway, 11th Floor
New York, New York 10018
By: Michael Z. Brownstein, Esq.
Robert A. Wolf, Esq.

PICK & ZABICKI LLP
*Counsel for Morrison Tennenbaum PLLC*
369 Lexington Avenue, 12th Floor
New York, New York 10017
By: Douglas J. Pick, Esq.

LAW OFFICES OF RACHEL L. KAYLIE, P.C.
*Counsel for Elmwood Ventures LLC*
1702 Avenue Z, Suite 205
Brooklyn, NY 11235
By: Rachel L. Kaylie, Esq.

GARY J. WACHTEL, ESQ.
*Counsel for Feng Thomas Realty LLC*
450 Seventh Avenue, PH Suite
New York, New York 10123

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the joint motion (the "Motion," ECF Doc. # 99) filed by the United States of America ("United States"), on behalf of the U.S. Small Business Administration ("SBA"), by its attorney James M. McDonald, United States Attorney for the Southern District of New York, and Deborah Piazza, the Chapter 7 Trustee (the "Trustee") (together, the "Movants") for contempt and sanctions against debtor Elmwood Ventures LLC ("Debtor"), Stefan Stefanov, Arkady Vaygensberg, Morrison Tenenbaum PLLC ("MT"), Feng Thomas Realty LLC ("FTR" or "Landlord"), Lijun Feng, and Gary J. Wachtel, Esq. (collectively, the "Non-Moving Parties"). Filed with the Motion were three declarations: the *Declaration of Carly Weinreb* (the "Weinreb Decl.," ECF Doc. # 100), the *Declaration of Marc P. Yaverbaum* (the "Yaverbaum Decl.," ECF Doc. # 101), and the *Declaration of Roger Machin* (the "Machin Decl.," ECF Doc. # 102).

MT filed an objection to the Motion (the "Objection," ECF Doc. # 110), supported by the Declaration of Arkady Vaygensberg (the "Vaygensberg Decl.," ECF Doc. # 111), which the Debtor later adopted in whole (ECF Doc. # 119). In addition to the Objection, the declarations of Lijun Feng (the "Feng Decl.," ECF Doc. # 113), Karina Gorfin as counsel to FTR (the "Gorfin Decl.," ECF Doc. # 114), and Gary J. Wachtel (the "Wachtel Decl.," ECF Doc. # 116) (together, the "FTR Declarations") were filed in response to the Motion, each objecting to a finding of contempt and sanctions against the undersigned party. The Movants filed a reply in further support of the Motion (the "Reply," ECF Doc. # 122). A hearing on the Motion was held on September 17, 2026.

For the reasons as explained below, the Court **GRANTS** the relief as requested in the Motion as to the civil contempt of the Debtor, Stefanov, Vaygensberg, and MT. The amount of contempt sanctions will have to be determined at a subsequent hearing. The Motion **is DENIED** as to Feng, FTR, and Wachtel.

# I. BACKGROUND

## A. Pre-Bankruptcy Petition

The Debtor previously operated a restaurant, Buddha Bar, at 62 Thomas Street, New York, New York (the "Premises"). (Declaration of Stefan Stefanov, the "Stefanov Decl.," ECF Doc. #7 ¶ 5.) The Debtor is wholly owned by Stefanov, who wanted to bring the Buddha Bar concept from abroad to New York. (*Id*. ¶ 6.) The Debtor has no legal relationship or common ownership with any other Buddha Bar location. (Weinreb Decl., Ex. 1 ("341 Mtg. Tr.") 13:13-17:14). In 2016, the Debtor executed a twenty-year commercial lease with FTR to operate Buddha Bar at the Premises, as well as paying a $183,333.33 security deposit to FTR. (Motion ¶ 5; Weinreb Decl., Ex. 2 (the "Lease").) Stefanov signed the lease on behalf of the Debtor and Feng as owner of FTR signed on behalf of the Landlord. Stefanov personally guaranteed the Lease. The Lease defined "Tenant's Property" as follows: "movable fixtures and movable partitions, telephone and other equipment, computer systems, trade fixtures, furniture, furnishings, equipment, shelving, check-out machinery, scanning systems and other items of personal property which are removable without material damage to the Premises, the Commercial Unit or the Building, as well as cooking and kitchen equipment and fixtures." (*Lease* at 4.)

The Debtor was ready to open Buddha Bar in spring 2020 when the COVID-19 pandemic paused any such plans. (Stefanov Decl. ¶ 8.) Unable to open, the Debtor took advantage of the

SBA COVID loan programs, executing a Note and other loan documents to take out an SBA COVID-19 Economic Injury Disaster Loan for $150,000 with an annual 3.75% interest rate with a 30-year repayment term ("SBA Loan"). (Motion ¶ 7.) Per an agreed upon security agreement, the Debtor provided the SBA with a security interest in "all tangible and intangible personal property of the debtor" that Debtor "now owns or shall acquire," including but not limited to "inventory," "equipment," and "accounts," as well as all "accessories, parts, supplies and replacements" for such collateral, to secure the payment and performance of Debtor's obligations under the SBA Loan ("SBA Security Agreement"). (SBA Proof of Claim, Claim 6.) The Buddha Bar ultimately opened in July 2021 (Stefanov Decl. ¶ 8), but the Debtor continued to fall behind on rent, requiring Vaygensberg to execute a personal guaranty of Debtor's rent arrears. (Motion ¶ 8.) This did not forestall any issues for the Debtor, and on September 10, 2024, FTR served Debtor with a Notice of Cancellation and Termination of Lease (ECF Doc. # 25 ¶ 11) and commenced a holdover proceeding in state court against the Debtor on September 10, 2024. *Feng Thomas Realty LLC v. Elmwood Ventures LLC*, Index No. LT-316594-24/NY (Civ. Ct., N.Y. Cnty.) (the "Holdover Proceeding").

While the Holdover Proceeding was pending, the Debtor executed an Asset Purchase Agreement (the "APA," Weinreb Decl., Ex. 5) with Asia Odyssey Inc. ("AO") to sell "all of the Assets of [Buddha Bar] free and clear of all liens, claims and encumbrances," including "all trade fixtures, Restaurant and office equipment, supplies and inventory, and other property used in the Restaurant." (APA ¶ 1). Per the APA, the Debtor claimed that it had "authority and is the owner of and has good and marketable title to the Assets, free of all liens, claims or encumbrances[]," which the SBA contests. (*Id.* ¶ 7.) However, AO determined that they would not continue lease negotiations, voiding the APA. (*See* Weinreb Dec., Ex. 7.) FTR soon after

obtained a judgment of possession for the Premises (Motion ¶ 12). The New York City Marshal issued a notice of eviction against the Debtor. (*Id.*)

**B. The Bankruptcy Case**

On May 6, 2025 (the "Petition Date"), the Debtor filed for relief under Chapter 11 of the Bankruptcy Code. (The "Petition," ECF Doc. # 1.) The Debtor listed in its schedules that it owned liquor inventory worth $52,000, furniture worth $1,151,387, machinery and equipment worth $231,865, and a 15-foot glass Buddha statue worth $135,000 (the "Sculpture"). (The "Schedules," ECF Doc. # 27 at 3-4.) Soon after the Petition Date, FTR filed an unsecured claim for the unpaid rent totaling $1,237,036.30, and the SBA filed a secured claim arising from the unpaid SBA Loan and interest due for $160,832.24. (Motion ¶¶ 14-15.) The Debtor and SBA came to an agreement over adequate protection payments, which stipulated that the SBA would have a valid, enforceable, fully perfected replacement lien, effective as of the Petition Date, upon "all existing and hereafter-acquired property of Debtor of any kind or nature including, but not limited to, Debtor's real, personal, tangible and intangible property, as well as any and all proceeds . . . and profits thereof." (ECF Doc. # 42 ("Adequate Protection Agreement") ¶ 1(b).)

FTR sought to lift the automatic stay to permit the continuation of the Holdover Proceeding. (ECF Doc. # 25.) With the Debtor consenting to the partial lift of the stay, the Court entered an order on July 7, 2025 authorizing FTR "to return to state court to complete the eviction of the debtor . . . from the leased premises . . . ." (ECF Doc. # 39, the "Lift Stay Order".) There was no additional relief granted in the order. (*Id.*) Also on July 7, the Debtor filed a motion to dismiss the bankruptcy case for a failure to confirm a feasible reorganization plan, (ECF Doc. # 41), which the SBA later contested (ECF Doc. # 43). On September 10, 2025, this Court denied the motion to dismiss and instead granted the SBA's cross motion to convert

the case to Chapter 7. (*See* ECF Doc. # 48.) Deborah J. Piazza was ultimately appointed as the Chapter 7 Trustee (the "Trustee"). (ECF Doc. # 49.)

**C. Stipulation and Sale of Debtor's Property**

Unbeknownst to the Court or the SBA, the Debtor and FTR had been in discussions as early as July 10, 2025 to settle the dispute regarding the Lease. (Motion ¶ 19.) During these discussions, counsel for FTR noted that the Debtor was expected to vacate the premises and leave everything currently situated there intact, "including the Buddha (lol)." (Weinreb Decl., Ex. 8 FTR000516.) On July 24, 2025, the Debtor and FTR executed a stipulation in the Holdover Proceeding in which the Debtor agreed to vacate the Premises by July 25, 2025 as an "*inter alia*" eviction, leaving it in "'As Is' condition, with all contents of furniture, inventory, and fixtures inside . . . " as well as assigning the $183,333.33 security deposit to FTR. (Weinreb Decl., Ex. 10 (the "Stipulation") at 2.) A video of the premises from July 25, 2025 indicates that the Debtor left the Premises fully intact with all furniture, equipment, and other assets remaining inside, including the Sculpture. (Weinreb Decl., Ex. 13.) Stefanov's Surrender Affidavit attached to the Stipulation further attested that "[a]ny personal property remaining in the Demised Premises as of the date hereof is deemed abandoned by Elmwood Ventures LLC." (Stipulation, Ex. A.) The Stipulation was signed by Lawrence Morrison, Esq., of MT on behalf of the Debtor and Gary Wachtel, Esq., signed the Stipulation on behalf of FTR. (Stipulation at 5.) On July 29, 2025, Wachtel sent an email to Morrison, stating "[the] Buddha is deemed a fixture by Landlord, not removeable from the premises." (Weinreb Decl., Ex. 14 at FTR000460.) Morrison replied, "Thank you for letting us know." (*Id.*) Neither the Court nor the SBA were made aware of the existence of the Stipulation or that it was so-ordered by the State Court in the Holdover Proceeding. The existence of the Stipulation was not raised by

counsel during this Court's hearing on September 10, 2025 attended by the Debtor. (Motion ¶ 25.)

Prior to the Section 341 creditors meeting (the "341 Meeting") that was ultimately held on February 11, 2026, the Trustee hired Marc P. Yaverbaum from MYC & Associates, Inc., an auction, appraisal, liquidation, and real estate brokerage firm, to inspect the Premises as part of the Trustee's efforts to marshal the Debtor's assets. (Yaverbaum Decl. ¶¶ 1-3.) The Premises were inspected on October 9, 2025, at which time the Premises reflected conditions similar to the June 25, 2025 video. (*See* Yaverbaum Decl. Ex. A.)

FTR ultimately re-leased the Premises to Voss Events, Inc. ("Voss") sometime in December 2025 and informed Voss that removing the property in the Premises was not FTR's responsibility. (Motion ¶ 29.) Voss retained Metro Auctions LLC on Thursday, January 29, 2026 ("Metro Auctions") to conduct an online auction of Debtor's property at the Premises, representing to Metro Auctions that Voss is the "sole and absolute owner of the property described in this Agreement and ha[s] the full right to sell and transfer the same," and that "all assets to be sold are free and clear of any liens, encumbrances, claims or liabilities." (Weinreb Decl., Ex. 17 at METRO0002.) The auction was advertised online and closed on Monday, February 2, 2026, four days after Metro Auctions were retained; ultimately 297 items were sold for a total of $29,030.02. (Weinreb Decl., Ex. 19 at METRO0015.)

During the 341 Hearing, principals of the Debtor indicated that the Sculpture was hand made through layering small layers of glass, and while the individual pieces of glass cost $135,000, market comparable statutes cost between $1 to $2 million: "American company gave us price for Buddha, $1.8 million. From Ukraine, it cost us $130,000." (341 Mtg. Tr. 26:6-7.)

They additionally indicated that they turned over all valuable property to FTR pursuant to the Stipulation and that the Sculpture was destroyed. (*Id.* at 24:11-22.)

Upon learning of the Stipulation, subsequent sale, and ultimate destruction of the Sculpture, the Movants filed a motion for Rule 2004 discovery of Debtor, FTR, and Metro Auctions. (ECF Doc. # 84.) This motion was granted, authorizing: (1) document requests and a 30(b)(6) deposition of Debtor; (2) a subpoena to FTR for documents and a 30(b)(6) deposition; and (3) a subpoena to Metro Auctions for documents. (ECF Doc. # 91.) Per the Motion, the Debtor has failed to produce responsive emails, has failed to respond to at least 12 discovery requests, and has not made the Debtor's or FTR's Rule 30(b)(6) witnesses available for deposition after the Movants agreed to several adjournments. (Motion ¶¶ 38-39.)

**D. Movants' Claims**

The Movants argue that the Court should hold in contempt and sanction the Non-Moving Parties for signing the Stipulation and for divesting the bankruptcy estate of Debtor's property without Court approval in violation of the automatic stay.

1. The Property Converted to FTR Under the Stipulation was Property of the Bankruptcy Estate

The Movants claim that the real property conveyed to FTR, that being "all contents of furniture, inventory, and fixtures inside" the Premises as well as Debtor's $183,333.33 security deposit, were property of the bankruptcy estate and therefore protected by the automatic stay. (Stipulation at ¶¶ 6, 8.) They claim that in a commercial leasehold context, it is "well-settled" that the tenant's commercial fixtures, also known as "trade fixtures," remain the tenant's property and *do not* become permanent fixtures. (Motion ¶ 53 (citing *In re Arista Devices Corp.*, 94 B.R. 26, 29 (E.D.N.Y. 1988) (defining trade fixtures as items "placed upon or annexed to the property for the purpose of carrying on the tenant's business or trade during the lease term.)) So

long as they can be removed at the end of the lease without substantial injury to the real property, the trade fixtures remain the tenant's personal property. (Motion ¶ 53 (citing *In re Howard Laundry Co.*, 203 F. 445, 447 (2d Cir. 1913) (the "presumption" under New York law is that "trade fixtures belong to the tenant."))

The Movants claim that the furniture valued at $1,151,387, liquor inventory valued at $52,000, and machinery and equipment valued at $231,865 are all personal property and trade fixtures belonging to the Debtor and therefore rightfully part of the Debtor's estate. (Motion ¶ 54.) While the Movants argue that it is clear that the movable assets are all the Debtor's personal property, the Motion cites to the Lease as evidence of the parties' intent to treat the Debtor's kitchen equipment and machinery as tenant's personal property. (Motion ¶ 57.) Such language includes defining "Tenant's Property" as "movable fixtures and movable partitions, . . . trade fixtures, furniture, furnishings, equipment, . . . other items of personal property which are removable without material damage to the Premises . . . as well as cooking and kitchen equipment and fixtures, and "Nothing in [the Lease] shall be construed to give Landlord title to, or to prevent Tenant's removal of, all business fixtures, trademarked items, moveable office furniture and equipment and other moveable personal property . . . ." (Lease at 4, 18.) Movants additionally cite caselaw holding that commercial kitchen appliances are tenant trade fixtures, noting that the trade fixtures that were on the Premises have since been removed after being sold at the Voss auction. (Motion ¶ 56.) Therefore, they argue that the Debtor's movable personal property became property of the estate as of the Petition Date. (*Id.* ¶ 58.)

*a. The Sculpture was Property of the Bankruptcy Estate*

The Movants argue that the Sculpture, despite weighing multiple tons, was not a permanent fixture and was rightfully property of the Bankruptcy Estate. (*Id.* ¶ 59.) The

Sculpture, being a large glass buddha, specifically related to the Debtor's restaurant theme and was meant to promote the Buddha Bar brand. (Motion ¶ 60.) The Movants cite *In re Tavern on the Green Ltd. P'ship*, 2010 WL 148421 (Bankr. S.D.N.Y. Jan. 12, 2010), where Judge Gropper held that a mural installed at the debtor restaurant constituted personal property of the debtor when the mural helped create a "décor and environment closely connected" with the Restaurant and the debtor's proprietor. *In re Tavern on the Green Ltd. P'ship*, 2010 WL 148421 at *5. The court additionally focused on the fact that the mural depicted the proprietor's family as further proof that "it [was] particularly unlikely that there was an intention . . . to leave it behind. . . ." *Id.* at 6. The Movants argue that this is analogous to the situation with the Sculpture at the Buddha Bar – the Sculpture was installed to help cultivate the desired environment of Buddha Bar with no other relation to 62 Thomas Street, further evidenced by the destruction of the Sculpture after the Debtor left the Premises. (Motion ¶ 61.)

Movants do note that certain large-scale artwork may constitute permanent fixtures if the art cannot be easily removed without causing injury to the realty. *See Snedeker v. Warring,* 12 N.Y. 170, 175 (1854) (holding that large stone statue and sundial were permanent fixtures). Despite the size of the Sculpture, Movants cite to the declaration of Roger Machin, a sculptor with expertise in the installation and rigging of large-scale sculptures, artifacts, and objects. (Manchin Decl. ¶ 1.) Mr. Machin co-founded Methods and Materials, Inc., a company dedicated to fine art rigging, installation, and re-location, and has since taught rigging classes at museums such as the Met and Smithsonian, ultimately writing the manual on large-scale sculpture rigging for the Smithsonian. (*Id.*)

According to Mr. Machin, the Sculpture could have been moved through one of two methods – either via cutting off the head using a diamond blade to ensure the Sculpture fit

through the door right-side up, or via a purpose-built crate filled with protective foam to house the Sculpture before turning it on its side to fit through the door. (*Id* ¶¶ 11-31.) While Mr. Machin has not overseen a project via the first method, he has worked for companies that have; as for the second method, Mr. Machin used this "crating and foam technique" to move a sculpture by Jeff Koons into and out of the Whitney Museum. (*Id* ¶¶ 12, 26.) The Movants argue that as either method could be used, and that the Sculpture was designed for use solely in the Buddha Bar, and that there has not been a showing of it being permanently affixed to its pedestal, it is not a fixture and is therefore property of the estate. (*Id.* ¶ 63.)

*b. Debtor's Security Deposit is Property of the Estate*

Movants argue that under New York law, a landlord must return the security deposit to the tenant, subject to any right of setoff. (Motion ¶ 65 (citing *Camacho v. Paduch*, 60 Misc. 3d 837, 841-42 (N.Y. City Ct. 2018).) The Motion notes that per FTR's claim, FTR had not applied Debtor's security deposit toward rent arrears or other defaulted Lease obligations. (*See* Claim No. 4-1.) As such, the Debtor's $183,333.33 security deposit remained its property and became property of the estate on the Petition Date. (Motion ¶ 66.)

2. The SBA Lien Encumbers all the Debtor's Property

Via the SBA Loan and Adequate Protection Agreement, the Movants argue that the SBA has a security interest in all of Debtor's tangible and intangible then-existing and after-acquired property, as well as the proceeds of any sales of such property. (*Id.* ¶ 67.) The fact that the property has been sold does not impact the lien; it has now attached to the proceeds of the sale. (*Id.* ¶ 68.)

3. The Non-Moving Parties Should be Held in Contempt for Violating the Automatic stay and the Partial Lift Stay Order

Movants lastly argue that the Non-Moving Parties should be found in contempt under Bankruptcy Rule 9020 for failing to comply with the automatic stay by the Debtor and FTR's signing of the Stipulation and conveyance of the Debtor's personal property and security deposit. (Motion ¶ 72.) The Stipulation as signed permitted FTR to proceed with, "*inter alia*," the eviction of Debtor, (Stipulation ¶ 5), when in fact the Lift Stay Order permitted FTR to effectuate the eviction and nothing else. (Motion ¶ 72.) The Movants argue that the Non-Moving Parties knew that they needed to seek relief from the automatic stay to take any action against the Debtor's property given the Non-Moving Parties sought relief from the automatic stay with respect to the Holdover Proceeding. (*Id.* ¶ 73.) Ultimately, Movants argue that there was no objectively reasonable basis for the Non-Moving Parties' actions. (*Id.*)

4. Requested Relief

The Movants request the Court enter an order holding the Non-Moving Parties in contempt and declare void the transactions that divested Debtor's estate of its property and the related Stipulation provisions. (*Id.* ¶ 76.)

The Movants additionally argue that sanctions of compensatory damages are appropriate to ensure the SBA is compensated for the loss of its collateral, the Trustee can recover for the loss of the Debtor's property in any amount that exceeds the SBA's secured claim, and that the Trustee and United States are compensated for costs paid in connection with the Motion and associated investigation of the lift stay violation. (*Id.* ¶ 78.)

Movants argue that the Debtor's alienated tangible personal property, excluding the Sculpture, should be valued at no less than $152,000. Movants note that the Debtor transacted to sell to AO all personal property – excluding food and liquor – for $100,000, and that the

Debtor's schedules listed the value of the liquor inventory as of the Petition Date as $52,000. (*Id.* ¶ 79.) Recognizing that the property was later auctioned at only $29,030.20, Movants argue that the Court should caution relying on this number for the property's true value. They argue that the auction was held online on "short notice," which curtailed bidding and limited purchasers' ability to do inspections and research, and was handled by a private auctioneer without the Trustee's incentive to maximize sale value. (*Id.* ¶ 80.) Movants also seek $183,333.33 in actual loss for the Debtor's assignment of the security deposit to FTR without Court permission. (*Id.* ¶ 81.) Lastly, as Movants argue that the Sculpture would have sold for at least $1 million and assume the cost to move it would be $450,000 per the estimate of Mr. Machin, the net profits of a sale would have been approximately $550,000. (*Id.* ¶ 82.) In total the Movants seek $885,333.33, with $160,832.24 allocated to the SBA to satisfy its secured claim in full, in addition to attorneys' fees awarded to the Trustee and expert fees awarded to the United States. (*Id.* ¶ 83.)

While the Movants argue that bad faith is not required for the court to impose sanctions after the decision in *In re Windstream Holdings, Inc*., 105 F.4th 488 (2d Cir. 2024), they argue that all of the Non-Moving Parties acted in bad faith, further supporting the imposition of sanctions. (Motion ¶ 84.) The Debtor, Stefanov, and Vaygensberg engaged in bad faith by transferring estate property to FTR to promote their own self-interests at the expense of the SBA and other creditors; FTR and Feng received a lucrative benefit by signing the Stipulation via an increase in the potential sale or rental value of the Premises; and Debtor and FTR's counsel acted in bad faith by signing the stipulation without this Court's knowledge or authorization, and continued to withhold information in violation of their duty of candor. (Motion ¶¶ 84-85.)

**E. The Objection**

MT Objects to the Motion for the following reasons: that the signing of the Stipulation alone does not provide evidence of bad faith to support sanctions; that the Movants cannot show any actual loss to support awarding compensatory damages; that the Non-Moving Parties were not timely served; and that the matter cannot currently be adjudicated without further discovery and an evidentiary hearing.

1. <u>The Movants fail to Establish Bad Faith as Required to Sanction Counsel</u>

As the conduct alleged here is the signing of a stipulation as an advocate, MT argues that under *Worms v. Rozhkov (In re Markus)*, 78 F.4th 554 (2d Cir. 2023), the Second Circuit requires proof of bad faith before any sanction may be imposed on an attorney for acts taken in that role. (Objection at 8 (citing *In re Markus*, 78 F.4th at 565-66).) Importantly, the Objection disagrees with the Motion's reading of *Windstream*, a case that did not involve the issuance of sanctions against counsel as an advocate, as abrogating the attorney-based bad faith requirement of *Markus*. (Objection at 11.)

The sole action alleged in the Motion of bad faith is that MT signed the Stipulation; they do not allege that MT or Mr. Wachtel received benefit from the Stipulation or had any action after the signing. (*Id.*) The Objection sets out how this fails as a showing of bad faith. First, while the Motion claims that the Stipulation misleadingly recited that the Court permitted FTR to proceed with the *inter alia* eviction, the Movants do not identify any individual who actually was misled. (*Id.* at 12.) In addition, while Debtor's counsel did not mention the Stipulation at the September 10, 2025 hearing, the Motion does not allege that Mr. Wachtel was intentionally withholding the information, or that the Court or SBA asked any questions about the Stipulation, which by that point was on the State Court docket for months. (*Id.*) Lastly, while the Motion

faults MT for not taking action to purge its contempt after the March 2026 conference, by that point the auction had already closed and the Sculpture destroyed. (*Id*.)

MT goes on to argue that there is "clearly an ambiguity in the [] Lift Stay Order subjecting it to reasonable alternative interpretations." (*Id*. at 13.) The Objection argues that the language permitting FTR to "complete the eviction" while clarifying no "other relief is granted" should not be read to have permitted FTR to evict the debtor while at the same time effectively freezing the property inside pending a separate action. (*Id*. at 14.) To complete an eviction necessarily involves the disposition of abandoned property within the Premises, and given the Trustee's lack of administration of assets, there was no reason to assume the property was not abandoned. (*Id*.) In addition, this ambiguity further suggests that the first element of *Markus* – a "clear and unambiguous" order – is not satisfied. (*Id*.) There was no requirement for MT or Mr. Wachtel to have come to this Court to seek clarification on the ambiguity. (*Id*.)

Next, MT argues that the Stipulation itself transferred no property. If, as Movants argue, the SBA's lien continues against the property post sale and the property has not been abandoned, then post signing of the Stipulation the Debtor's personal property remained property of the estate, just now in the custody of the Landlord; what ultimately altered this was the sale and destruction of the property after the Auction. (*Id*. at 15-16.) Remedy for this is not a contempt motion for sanction, but an avoidance action under 11 U.S.C. § 549(a) seeking a recovery from Voss or Metro Auctions. (*Id*. at 16.)

Ultimately, MT points to the lack of secrecy as further evidence that there was no bad faith. While the Movants argue that that the Stipulation was concealed from the SBA and the Court, the SBA was involved in this case prior to the Stipulation; they knew the Lift Stay Order had been entered and that the Holdover Proceeding was permitted to continue. MT argues that

they did not conceal anything, but that the SBA failed to properly follow proceedings on two public dockets. (*Id*. at 17.)

2. Movants Cannot Show Actual Loss as Required for Compensatory Damages

If the Court were to find contemptuous conduct, Movants still fail to establish that compensatory damages are warranted.

First, MT argues that the Sculpture is not property of the estate, and in doing so looks to the third factor of determining if an item is a fixture – whether there was "intent that it be a permanent part of the real property." (*Id*. at 20.) MT argues that permanency does not mean indestructability, only that it will remain there for the foreseeable future; if there is that intention, then it is presumed to be a fixture. (*Id*.) Here, the Objection notes that the Sculpture was built piece by piece and put on top of a specific pedestal – while it has not been established if the Sculpture was affixed to the pedestal, MT argues that that alone is not evidence it was *not* affixed. (*Id*. at 21.) In addition, to remove the Sculpture would take great effort and cost up to $450,000 – it is not "movable" in any regular sense. (*Id*.) While it is listed as "Tenant's Property" in the Lease, it cannot be so as the Lease states that Tenant's Property includes only items "removable without material damage to the Premises." (*Id.* at 22.) The Objection claims that Mr. Machin explained that nearly $500,000 in damage would occur to Premises, but this does not appear in Mr. Machin's Declaration. Ultimately, even if the Court determines that MT does not prevail on the fixture question, there remain questions as to whether the Sculpture is property of the estate. Until that is answered, damages cannot be awarded. (*Id*. at 23.)

As for the remaining property, the Objection cites to Mr. Yaverbaum's own inspection of the Premises where he claimed that the property in the Premises would sell at auction for $25,000 at most, far below the $100,000 listed in the Schedules. (*Id*. at 24.) The actual auction

realized proceeds of $17,920.82 – MT argues that the Movants cannot both claim that the auction did not get fair value while also disavowing Mr. Yaverbaum's estimate. (*Id.*) As for the liquor inventory, it was not left at the Premises and not surrendered to FTR. MT had nothing to do with its ultimate disposition. (*Id.*) Lastly, while the Stipulation referenced assigning the security deposit, MT argues that that alone does not evidence it and instead claims that it had been assigned by the Debtor to the Landlord in December 2016, long before the Petition Date and therefore making the security deposit not part of the estate. (*Id.* at 25.)

The Objection additionally looks to the failure of the SBA and the Trustee to take any steps to protect its collateral. After the Trustee observed the collateral in the Premises in October 2025, it took no action to secure, remove, or preserve the property prior to the Auction. (*Id.* at 26.) Additionally, the Debtor never made any adequate protection payments; any party actually interested in the collateral and its underlying value would have inquired to inspect it or sought relief from this Court. (*Id.* at 27.) The SBA and Trustee's failure to act is an example of how, in their judgment, the collateral was not worth enough to act on.

3. Due Process Concerns

MT claims that service of the Motion was defective. Upon invoking Local Rule 9006-1(c) in filing the Notice of Motion, the Movants were bound to serve the Motion on the Non-Moving Parties within 14 days before the hearing. (Objection at 27-28.) However, the Notice of Motion filed by the Movants notes that Mr.Wachtel – individually, and on behalf of FTR and Ms. Feng – together with Debtor, Stefanov, and Vaygensberg, were not served with the Motion Papers until September 9, 2026, only eight days before the hearing. (ECF Doc. # 105.) For MT, while they were served on September 3, 2026, it was only via electronic means despite the requirement that a motion commencing a contested matter be served via hard copy. Electronic

service is insufficient to effectuate service and as such service was only effectuated when MT was served via a process server on September 9. (Objection at 28-29.) While the Non-Moving Parties all sought and were denied an adjournment to the September 17 hearing, that only resolved the issue of the hearing date. MT argues that the Court cannot find contempt or impose sanctions given the deficient notice period. (*Id*. at 30.)

The Objection additionally notes discovery issues present in this matter. Unless the Court orders otherwise, MT argues that the discovery rules of Part VII of the Federal Rules of Bankruptcy Procedure – including Rule 7026 (incorporating Fed. R. Civ. P. 26) and Rules 7028 through 7037 (depositions, interrogatories, document requests, requests for admission) – apply in a contested matter. (*Id*.) This is not just a procedural issue, but ensures the due process of all parties, something of particular import when a court is asked to exercise its contempt powers. (*Id*.) MT argues that while the Movants filed their Motion without the Debtor's and FTR's Rule 2004 testimony after this Court's authorization, neither MT nor any Non-Moving Party have taken any discovery on the Trustee, SBA, or their cited-to witnesses Mr. Yaverbaum and Mr. Machin. (*Id*. at 31.) MT argues that they should be permitted to depose all parties, with Mr. Machin being treated as an expert witness and thereby making Bankruptcy Rule 9014(c) and Civil Rule 26(a)(2) apply to his testimony. (*Id*. at 32-35.)

The Objection notes that this Court hoped to conclude this issue prior to September 30, 2026, on which date I retire. This is the reason given why the Movants filed the Motion prior to completing their own discovery and also why the Movants resisted adjourning the September 17 hearing. The Objection, while respecting the Court's prerogative to manage its calendar, argues that that alone does not excuse the Movants from "Rule 9014(b)'s service requirement, Rule 9014(c)'s grant of discovery, Rule 9014(d)'s requirement of live testimony on disputed facts, or

the fourteen-day notice period the Movants themselves invoked." (*Id*. at 36.) The Movants additionally, in waiting until September 3, 2026 to file the Motion after the pre-motion conference took place in March 2026, cannot now claim shortness of time for the failure of process. (*Id*.) The property at issue here has either been sold or, in the case of the Sculpture, destroyed; MT argues that there is no rush other than for the Movants to be heard by this Court alone. (*Id*.) These due process concerns cannot be ignored, and this Court must set a schedule that affords MT the due process, discovery, and evidentiary hearing to which the Bankruptcy Rules entitle them.

**F. FTR Declarations**

The three FTR Declarations each claim that they, either as principal of FTR or counsel to FTR, were never made aware by the Debtor of the SBA's liens on the personal property of the Debtor in the Premises. (Feng Decl. ¶ 9; Gorfin Decl. ¶ 9; Wachtel Decl. ¶ 8.) They each note that access was provided to Mr. Yaverbaum by the Landlord, but neither the Trustee nor SBA reached out again to discuss the personal property. (Feng Decl. ¶ 17; Gorfin Decl. ¶ 15; Wachtel Decl. ¶¶ 10-13.) Each FTR Declaration additionally attached a letter indicating that the initial security deposit from the Debtor was released to the Landlord. (*See* Feng Decl. Ex. A.) The language in pertinent part is as follows:

> [M]y client has agreed that the security deposit amount currently held by [FTR's Counsel] in escrow may be released to the Landlord and temporarily used for the purpose of paying the brokers who brought about this transaction and other immediate operational expenses in connection with the Premises. Upon receipt of rental payments from [the Debtor], the security deposit must then be replenished to the amounts as set forth in the Lease.

(*Id*.)

**G. Movants' Reply**

The Reply largely restates and supports the arguments made in the Motion.

The Movants restate their argument that there was no ambiguity to the Lift Stay Order and that the Non-Moving Parties clearly acted in noncompliance of the Lift Stay Order and the automatic stay. (Reply ¶¶ 1-8.) Movants claim that there was no "fair ground of doubt" for the Non-Moving Parties' actions – it was clear that the personal property of the Debtor and the Security Deposit were subject to the automatic stay. (*Id.* ¶ 8.) And despite the FTR Declarations each claiming that they were unaware that the SBA had a security interest in the Debtor's property, the Movants argue that based on the SBA filing their claim prior to the signing of the Stipulation that it is "simply not plausible" that FTR, Feng, and Wachtel were unaware of the SBA lien. (*Id.* ¶ 10.) With regards to the $183,333.333 security deposit, Movants argue that the letter provided by the FTR Declarations (Wachtel Decl. Ex. A) only shows that the security deposit was released to FTR for temporary use on December 1, 2026 – whether or not it was replenished, it was never assigned to the Landlord. (Reply ¶ 11.) The Movants finally reassert that the Sculpture was personal property of the Debtor not meant to be a permanent fixture. (*Id.* ¶¶ 12-15.)

With regards to bad faith, the Movants again argue that a finding of bad faith is not required to sanction MT and Wachtel, now arguing that even under *Markus* the alleged misconduct – signing the stipulation – was not done for the client's benefit. (*Id.* ¶ 17.) This is because MT owed a fiduciary duty to the beneficiaries of the estate, the same parties that were harmed by the signing of the Stipulation and the violation of the automatic stay. (*Id.* ¶ 18.) However, if bad faith is required, Movants argue that MT and Wachtel did act in bad faith by concealing the Stipulation to the SBA and the Court. (*Id.* ¶ 19)

Movants additionally contest the Objection's attempt to "shift blame" on to the Trustee – not only have they not "slept on their rights" by not liquidating the assets in an expedited manner, but that does not give the Non-Moving Parties any right to then violate the automatic stay. (*Id*. ¶¶ 21-23.) The Reply closes with the Movants reasserting that they have suffered actual loss (*id* ¶¶ 24-27), that additional discovery is not necessary (*id* ¶¶ 28-29), and that the fact that the Non-Moving Parties received actual notice of the hearing fourteen (14) days before the hearing means that they were not prejudiced in their ability to prepare a response (*id* ¶ 30).

## II. LEGAL STANDARD

The Movants seek relief pursuant to section 105(a) of the Bankruptcy Code, Bankruptcy Rules 7004, 9014, and 9020, and this Court's inherent authority to enforce its own orders. Section 105(a) of the Bankruptcy Code provides as follows:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

Bankruptcy Rule 9020 states that "Rule 9014 governs a motion for an order of contempt" made by a party in interest. FED. R. BANKR. P. 9020. Bankruptcy Rule 9014 governs contested matters of this type and service requirements in connection therewith. FED. R. BANKR. P. 9020. Bankruptcy Rule 7004 provides for the method of service. FED. R. BANKR. P. 7004. Per local rules, service of a motion commencing a contested matter under Rule 9014 shall be done via hard copy documents. S.D.N.Y. BANKR. LOC. R. 5005-2 (II.B. 2), *Procedures for the Filing, Signing, and Verification of Documents by Electronic Means*. Local Rule 9006-1 sets out a

fourteen (14) day service requirement, longer than the seven (7) day service requirement per Bankruptcy Rule 9006. S.D.N.Y. BANKR. LOC. R. 9006-1; FED. R. BANKR. P. 9006.

**A. Contempt**

"Federal courts have inherent equitable powers of courts of law over their own process, to prevent abuses, oppression, and injustices." *Royal Indian Raj Intern. Corp. v. Domains by Proxy, Inc.*, No. 08 Civ. 3445(JGK), 2011 WL 2946367, at *3 (S.D.N.Y. July 20, 2011) (citing *Int'l Prods. Corp. v. Koons*, 325 F.2d 403, 408 (2d Cir.1963)) (internal quotes omitted). Courts have embraced the inherent contempt authority as a power "necessary to the exercise of all others." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) (citations omitted); *see also id.* ("Courts independently must be vested with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates, and to preserve themselves and their officers from the approach and insults of pollution."); *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980) (stating that contempt powers are "the most prominent" of court's inherent powers "which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court") (citations omitted); *Sigety v. Abrams*, 632 F.2d 969, 976 (2d Cir. 1980) ("The power to fine and imprison for contempt, from the earliest history of jurisprudence, has been regarded as a necessary incident and attribute of a court, without which it could no more exist than without a judge.") (citations omitted).

The power to impose civil contempt sanctions applies in bankruptcy court as well. It is well established that bankruptcy courts have power to enter civil contempt orders. *See MF Glob. Holdings Ltd. v. Allied World Assurance Co. (In re MF Glob. Holdings Ltd.)*, 562 B.R. 41, 52 (Bankr. S.D.N.Y. 2017); *In re Chief Exec. Officers Clubs, Inc.*, 359 B.R. 527, 534 (Bankr. S.D.N.Y. 2007); *In re MarketXT Holdings Corp.*, Adv. Proc. No. 05-01268 (ALG), 2006 WL

408317, at *1 (Bankr. S.D.N.Y. Jan. 27, 2006) ("It is well accepted, in light of the 2001 amendments to Rule 9020, that bankruptcy courts have power to enter civil contempt orders."); *see also In re World Parts, LLC*, 291 B.R. 248, 253 (Bankr. W.D.N.Y. 2003) ("Bankruptcy courts possess the power to impose sanctions for acts of civil contempt.") (citing *In re Chateaugay Corp.*, 920 F.2d 183, 187 (2d Cir. 1990)). The Second Circuit has recently upheld the bankruptcy courts authority to find parties in civil contempt for violations of the automatic stay. *In re Windstream Holdings, Inc.*, 105 F.4th at 495.

The purpose of civil contempt is to compel a reluctant party to do what a court requires of him. *See Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir. 1986); *see also Shillitani v. United States*, 384 U.S. 364, 368 (1966) (stating that the act of disobedience consisted solely "in refusing to do what had been ordered" and the judgments imposed conditional imprisonment for the purpose of compelling the witnesses to obey the orders to testify). Civil contempt sanctions may also compensate for any harm that previously resulted. *See Nat'l Org. for Women v. Terry*, 159 F.3d 86, 93 (2d Cir. 1998); *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996) (stating that sanctions for civil contempt serve two purposes: to coerce future compliance and to remedy any harm past noncompliance caused the other party).

A court's inherent power to hold a party in civil contempt may be exercised only when (1) the order the party allegedly failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party has not diligently attempted in a reasonable manner to comply. *See King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995); *Monsanto Co. v. Haskel Trading, Inc.*, 13 F. Supp. 2d 349, 363 (E.D.N.Y. 1998). "Clear and unambiguous" means that the clarity of the order must be such that it enables the enjoined party "to ascertain from the four corners of the order precisely what acts are forbidden."

*Monsanto Co.*, 13 F. Supp. 2d at 363; *see also Terry*, 886 F.2d 1339, 1351–52 (2d Cir. 1989) (finding that the order could serve as the foundation for a contempt citation because it was sufficiently specific and clear as to what acts were proscribed to enable defendants to ascertain precisely what they could and could not do). "In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate 'reasonable certainty' that a violation occurred." *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002) (citation omitted); *see also Perez v. Danbury Hospital*, 347 F.3d 419, 423–24 (2d Cir. 2003) (stating that the evidence of noncompliance with the order must be clear and convincing). Where contempt is found, the defendant must not have diligently attempted to comply with the order. *See Terry*, 886 F.2d at 1351 (finding that defendants did not diligently attempt to comply with the court order in a reasonable manner; instead, the defendants proceeded with the demonstrations even though there was ample opportunity to comply with the court order either by curtailing their scope or by stopping them altogether). There can be "no fair ground of doubt" that the party involved violated the order. *See In re Windstream Holdings, Inc*., 105 F.4th at 495 (applying the "no fair ground of doubt" standard from *Taggart v. Lorenzen*, 587 U.S. 554, 557 (2019). *Taggart* held that the standard is satisfied "when there is no objectively reasonable basis for concluding that the [party's] conduct might be lawful under the [] order." *Id*. at 560.)

Any doubts about whether the requirements have been met in a particular case must be resolved in favor of the party accused of the civil contempt. *See* 7 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 37.51 (3d ed. 2006). But a finding of bad faith, willfulness, or substantial fault is not a prerequisite to a finding of civil contempt. *See* MOORE'S FEDERAL PRACTICE, at § 37.51; WRIGHT & MILLER, at § 2960 ("A violation of the decree need not be willful for a party to be held in civil contempt.").

**B. Sanctions**

"[T]he purpose of a civil contempt usually is to coerce compliance with a court order, and a coercive civil contempt sanction may be conditioned on continued noncompliance." *In re Markus*, 607 B.R. 379, 395–96 (Bankr. S.D.N.Y. 2019) (citing MOORE'S FEDERAL PRACTICE, at § 37.51); *see, e.g.*, *Terry*, 886 F.2d at 1351 (stating that because the sanctions, which were entirely conditional and coercive, were imposed to compel obedience to a court order, they were civil in nature). Where the purpose is to make the defendant comply, the court must exercise its discretion in determining the proper sanction. *See United States v. United Mine Workers*, 330 U.S. 258, 304 (1947). The court has broad discretion to fashion a coercive remedy based on the nature of the harm and the probable effect of alternative sanctions, and its determination will not be disturbed absent a clear showing of abuse. *EEOC v. Local 28, Sheet Metal Workers*, 247 F.3d 333, 336 (2d Cir. 2001).

When imposing coercive sanctions, a court should consider: (1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of the sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden. *Terry*, 886 F.2d at 1353 (citing *Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106, 110 (2d Cir. 1987)). In determining the proper sanction, "[t]he ultimate consideration is whether the coercive sanction . . . is reasonable in relation to the facts." *Terry*, 886 F.2d at 1353.

Where a movant seeks to find a party in civil contempt, i.e., by a clear and convincing evidence standard, any sanctions sought must also be civil, as opposed to criminal. *See Markus v. Rozhov*, 615 B.R. 679, 712 (S.D.N.Y. 2020).[1] "[W]hether a contempt is civil or criminal turns

---

[1] The district court in *Markus* noted that "[t]he question whether bankruptcy judges possess criminal contempt power is an unsettled and divisive question among the lower courts." *Id.* (citing John A. E. Pottow &

on the 'character and purpose' of the sanction involved. Thus, a contempt sanction is considered civil if it 'is remedial, and for the benefit of the complainant. But if it is for criminal contempt the [sanction] is punitive, to vindicate the authority of the court.'" *Bagwell*, 512 U.S. at 827–28 (quoting *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 444 (1911)).

"As *Gompers* recognized, however, the stated purposes of a contempt sanction alone cannot be determinative," as the Court must examine the character of the relief itself. *Id.* at 828. "[W]hether a sanction should be treated as criminal or civil in nature turns on several factors, including whether the sanction is intended to be compensatory or punitive; whether it is payable to the court or to the injured party; whether it is based on past wrongful conduct or is intended to coerce future compliance; and whether any opportunity to purge the sanction is provided." *Mackler Prods., Inc. v. Cohen*, 225 F.3d 136, 142 (2d Cir. 2000). "A sanction 'is considered civil and remedial if it either coerces the defendant into compliance with the court's order, or . . . compensates the complainant for losses sustained. Where a fine is not compensatory, it is civil only if the contemnor is afforded an opportunity to purge.'" *Markus*, 615 B.R. at 713 (quoting *Bagwell*, 512 U.S. at 829).

In determining whether to sanction an attorney for misconduct related to their contempt of court, a finding of bad faith *may* be required. In *Markus*, the Second Circuit differentiated situations where the contemptuous action falls within the attorneys "role as an advocate for her client as opposed to her role as an officer of the court." *Markus* 78 F.4th at 556 (cleaned up). "When a district court invokes its inherent power to impose attorney's fees or to punish behavior by an attorney in 'the . . . conduct of the litigation,' which actions are taken on behalf of a client,

Jason S. Levin, *Rethinking Criminal Contempt in the Bankruptcy Courts*, 91 AM. BANKR. L.J. 311, 313 (2017)); *see also* 10 COLLIER ON BANKRUPTCY ¶ 9020.01 (16th 2019) ("There may be a split developing among the circuits as to whether a bankruptcy court can punish criminal contempt.").

the district court must make an explicit finding of bad faith. But, when the district court invokes its inherent power to sanction misconduct by an attorney that involves that attorney's violation of a court order or other misconduct that is not undertaken for the client's benefit, the district court need not find bad faith before imposing a sanction under its inherent power." *Id*. (quoting *United States v. Seltzer*, 227 F.3d 36, 41-42 (2d Cir. 2000).)

## III. DISCUSSION

### A. Service

The Objection claims that service of the Motion on all Non-Moving Parties was insufficient. While the Motion was mailed electronically to the Non-Moving Parties on September 3, 2026, the parties were only officially served with the Motion papers on September 9, 2026 via FedEx Priority overnight delivery. (Objection at 28.) This left only eight (8) days between the papers being served and the hearing on September 17, 2026 – insufficient per Local Rule 9006-1. However, Local Rule 9006-1 states in pertinent part that "*Except as otherwise ordered by the Court*, all motion papers not covered by subparagraphs (a) and (b) shall be served at least fourteen (14) days before the return date." S.D.N.Y. BANKR. LOC. R. 9006-1 (emphasis added). This Court denied an adjournment request to postpone the September 17, 2026 hearing date upon learning from that the Non-Moving Parties were served eight days before the hearing date (*see Letter Requesting Adjournment of the Hearing Scheduled to be Held on September 17, 2026*, ECF Doc. # 107), longer than the required time for service per the Bankruptcy Rules. *See* FED. R. BANKR. P. 9006 ("A written motion . . . and notice of any hearing must be served *at least 7 days before the hearing date. . . .*") (emphasis added).

As this Court ordered for the September 17 hearing to continue as scheduled upon learning of service being effectuated on September 9, and because service as it was effectuated

was in line with the Federal Rules of Bankruptcy Procedure, the Court **FINDS** that that service was properly effectuated on the Non-Moving Parties.

**B. Contempt**

The automatic stay and the Lift Stay Order provide a basis for holding the Debtor, Stefanov, Vaygensberg, and MT in contempt. As such, the motion for contempt is **GRANTED** as to Debtor, Stefanov, Vaygensberg, and MT. The motion is **DENIED** against Feng, FTR, and Wachtel.

1. <u>Clear and Unambiguous</u>

Here, the Automatic Stay and the Lift Stay Order were clear and unambiguous – there was "no clear doubt" that signing away the personal property of the Debtor located in the Premises was in violation of the Lift Stay Order. The automatic stay is "a foundational principle of [] the Bankruptcy Code." *In re Procel*, 652 B.R. 577, 582 (Bankr. S.D.N.Y. 2023); *accord In re Solis*, 137 B.R. 121, 130 (Bankr. S.D.N.Y. 1992) ("The automatic stay is one of the foundational principles on which the whole bankruptcy system is built."). As such, the automatic stay is a "clear and unambiguous" order for purposes of contempt. *See, e.g.*, *In re Arcapita Bank B.S.C.(c)*, 648 B.R. at 498; ("noncompliance with the order (*i.e.*, the automatic stay) is clear and convincing").

The Lift Stay Order granted relief from the automatic stay for the limited purpose of allowing FTR to return to state court to complete the eviction of the Debtor from the leased premises and specified that "[n]o other relief is granted." (Lift Stay Order at 1.) MT's claims that the language of the Lift Stay Order was ambiguous whether or not it allowed the Debtor to enter the Stipulation, but that framing misses the issue at bar. It is not that the parties entered the Stipulation, but that the Stipulation as entered into alienated property that *remained covered by*

*the automatic stay* to FTR. The Lift Stay Order was clear and unambiguous – FTR was permitted "to return to state court to complete the eviction of the debtor Elmwood Ventures LLC" and "*[n]o other relief is granted*." (*Id.*). Therefore, it was not an "objectively reasonable" conclusion by the Debtor, its principals, or its counsel that it could, in an effort to complete the eviction, enter into a stipulation that alienated property that the Debtor and it counsel knew was both subject to the automatic stay and a claim by the SBA. *Taggart*, 587 U.S. at 557.

2. <u>Noncompliance Clear and Convincing</u>

Debtor and FTR—through their counsel and in concert with Stefanov, Vaygensberg, and Feng—signed a Stipulation to convey Debtor's security deposit and tangible personal property to FTR. (Motion ¶ 72.)

The Stipulation misleadingly represented that this Court had vacated the automatic stay. (Stipulation ¶ 5.) ("Respondent acknowledges that an Order entered July 7, 2025 in Bankruptcy Court, SDNY, vacated the automatic stay permitting Petitioner to proceed with *inter alia* eviction of Respondent.") This Court's Lift Stay Order was limited solely to the eviction. (Lift Stay Order at 1.) The Stipulation acknowledged the Lift Stay Order but stipulated to leave the Premises "[a]s [i]s," "with all contents of furniture, inventory, and fixtures inside," and assigned its $183,333.33 security deposit to FTR. (Stipulation ¶¶ 6, 8.) The Stipulation falsely stated that "all items remaining in the Premises are owned outright by [Debtor], and there exists no liens attached to anything being surrendered[.]" (Stipulation ¶ 12.)

Stefanov's Surrender Affidavit attached to the Stipulation further attested that "[a]ny personal property remaining in the Demised Premises as of the date hereof is deemed abandoned by Elmwood Ventures LLC." (Stipulation, Ex. A ¶ 4.) In exchange, FTR agreed to release

Debtor and its guarantors, Stefanov and Vaygensberg, from "all obligations arising under or in connection with the lease, tenancy and/or possession of the Premises." (*Id.*)

The Debtor did not seek or receive an order from this Court authorizing the Debtor to abandon this property. The state court entered the Stipulation on July 28, 2025. (Motion ¶ 72.) The Parties did not seek this Court's approval of the Stipulation.

3. <u>No Diligent Attempt to Comply</u>

The Non-Moving Parties did not diligently attempt to comply with the Automatic Stay in a reasonable manner. The Non-Moving Parties previously sought relief from this Court in connection with FTR's request to pursue the Debtor's eviction in the Holdover Proceeding. (Lift Stay Motion, ECF Docs ## 25,28.) MT is experienced bankruptcy counsel familiar with the automatic stay and the necessity of moving the Court to obtain relief from it. The Non-Moving Parties nonetheless did not attempt to obtain this Court's approval or SBA consent before executing the Stipulation. (Motion ¶ 73.)

According to Wachtel, "[p]resumably the Debtor knew of SBA's liens but the Landlord and I did not. Presumably the Debtor knew of the agreement that it had entered into with the SBA but the Landlord and I did not. We relied upon Debtor's representations made in the stipulation." (ECF Doc. # 116, the "Wachtel Decl." ¶ 8.) This sentiment was reiterated in both the Gorfin Declaration and the Feng Declaration. (Feng Decl. ¶ 9; Gorfin Decl. ¶ 9.) Additionally, Wachtel notes that the SBA never contacted the Landlord about the property, further giving the Landlord and its counsel no reason to suspect that the property had an attached security interest. (*Id.* ¶ 13.) Movants argue that despite this claim from FTR, Feng, and Wachtel, it was simply "not plausible" for them to be unaware of the SBA's security interest given the SBA Claim and Adequate Protection Agreement filed prior to the signing of the

Stipulation. (Reply ¶ 10.) However, despite the Reply claiming that it was not plausible for them to be unaware, the Movants have failed to show that FTR, Feng, or Wachtel were aware of the SBA security interest at the time of the singing of the Stipulation and that their sworn testimony was false. Movants additionally do not assert that the SBA ever contacted FTR, Feng, or Wachtel about the property on which they had a security interest. Ultimately, the Movants carry the burden to show that the FTR, Feng, and Wachtel made no diligent effort to comply with the automatic stay. The Movants have failed to meet that burden.

The Debtor, its principals and its counsel were responsible for assuring that the SBA's security interest was protected. As such, the motion for contempt is **GRANTED** as to Debtor, Stefanov, Vaygensberg, and MT. The motion **is DENIED** as to Feng, FTR, and Wachtel.

**C. Void Transactions**

The Court also declares void the transactions that divested Debtor's estate of its property and the related Stipulation provisions. *See FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 137 (2d Cir. 1992) ("[A]ctions taken in violation of the stay are void and without effect."); *In re Great Atl. & Pac. Tea Co., Inc.*, 2026 WL 1764204, at *39 (Bankr. S.D.N.Y., Jun. 17, 2026) (acts taken in violation of automatic stay were "void" even though the court declined to hold creditor in contempt).

**D. Sanctions**

With contempt established, the next issue for the Court to determine is whether sanctions are appropriate, and if so, to what extent. "[T]he purpose of a civil contempt usually is to coerce compliance with a court order, and a coercive civil contempt sanction may be conditioned on continued noncompliance." *In re Markus*, 607 B.R. at 395–96 (citing MOORE'S FEDERAL PRACTICE, at § 37.51).

Here, sanctions are warranted. Movants seek compensatory damages only. Compensatory damages may be awarded in "non-nominal amounts to compensate an injured party," *In re Markus*, 78 F.4th at 570, for "the actual damages incurred," *In re Johns-Manville Corp.*, 666 B.R. 476, 488 (Bankr. S.D.N.Y. 2025), and "may include attorneys' fees; litigation costs; travel expenses; other actual losses, such as wages or business income; and possibly emotional distress damages," *id*. However, the Court orders an additional hearing to determine the correct amount of sanctions.

1. <u>Personal Property Excluding the Sculpture</u>

Movant asserts that the Court should value Debtor's alienated tangible personal property, excluding the Sculpture, at no less than $152,000. (Motion ¶ 79.) Only two months before the Petition Date, Debtor transacted to sell all of Debtor's tangible personal property, excluding its food and liquor inventory, for $100,000. (*Id.*) The Movants argue that the APA thus evidences the fair market valuation of Debtor's property at that time. (*Id.*) Because the APA fell through, these assets became property of the estate on the Petition Date and should be valued at $100,000.20. (*Id.*) In addition, Debtor's Schedules represent that the value of its liquor inventory as of the Petition Date was $52,000. (Schedules at 3.) Because the $100,000 of assets that Debtor transferred to FTR pursuant to the Stipulation did not include Debtor's liquor inventory, Movants argue that $52,000 should be added to the total damages. (*Id.*) Therefore, Movants assert that the total value of tangible estate property, excluding the Sculpture, unlawfully removed from the estate was no less than $152,000. (*Id.*)

Movants argue that while the 297 items of the Debtor's personal property were sold at Auction for $29,030.20, that amount "likely significantly underestimates the value of the property." (Motion ¶ 80.) The Movants characterize the Auction as a "fire sale." (*Id.*) The

"short notice" Auction was posted Thursday, January 29, 2026, with a bidding deadline the following Monday at 7:30 PM. (Weinberg Decl. Ex. 18; Motion ¶¶ 30-32.) The Auction, held over the course of a weekend and only advertised online, did not maximize sale values. *See In re Mam's Original Foods, Inc.*, 234 B.R. 500, 504 (Bankr. C.D. Cal. 1999) ("Absent a recognized market with established prices, a trustee is required to advertise the property to be sold. The method of advertising must be whatever a prudent seller would choose for selling property of the kind at issue. For the restaurant equipment in this case, for example, a prudent seller typically advertises the property for sale on the internet and by newspaper.")

In contrast, the Objection cites to Mr. Yaverbaum's own inspection of the premises noting that the property in the Premises would sell at auction for at most $25,000, far below the $100,000 listed in the Schedules. (Objection at 24.) The actual auction realized proceeds of $17,920.82 – MT argues that the Movants cannot both claim that the auction did not get fair value while also disavowing Mr. Yaverbaum's estimate. (*Id.*)

As for the liquor, MT asserts that the Movant's $52,000 liquor component estimate (as of the date of the filing of the Chapter 11 Petition) that was included in their $152,000 figure is for liquor inventory that was consumed and not replenished. (*Id.* at 4.) MT asserts that "The liquor was not left at the Premises and was not surrendered to FTR under the Stipulation. Whatever became of it is a matter between the Trustee and Debtor – though it is likely that it was simply consumed through operations and not replaced; it has nothing to do with MT." (*Id.* at 24.)

At this point, the Court is unable to make a proper determination on the true value of the property. There are disputes about the value of the property that was sold without a good accounting of what was sold provided to the Court, Movants are lacking likely critical discovery on the items that were on the premises and what was ultimately auctioned, the Non-Moving

Parties have been unable to depose or question Mr. Yaverbaum, and there are open questions as to what has happened to the liquor inventory of the Debtor and if it would even have any value. Given the discrepancies around value of the property, unless the parties are able to resolve the issues by agreement, the Court will need to hold a further hearing before new judge to determine the value of the property.

2. Security Deposit

Additionally, the Movants suffered an actual loss of $183,333.33 caused by Debtor's assignment of its security deposit to FTR as part of the Stipulation. (Motion ¶ 81.) New York law provides that a tenant's security deposit "shall continue to be the money of the person making such deposit or advance and shall be held in trust by the [landlord] and shall not . . . become an asset of the [landlord] . . . ." N.Y. Gen. Oblig. Law § 7-103(1); *accord Camacho*, 60 Misc. 3d at 841-42 ("The meaning of Section 7-103(1) couldn't be more clear: the security deposit is the tenant's, not the landlord's, money."). At the end of the lease term, the landlord must return the security deposit to the tenant, subject to any right of setoff. *See Camacho*, 60 Misc. 3d at 842 (citing cases); *People v. Horowitz*, 309 N.Y. 426, 428 (1956) (stating that a tenant's security deposit "become[s] a trust fund, remaining the property of the tenant although in the custody of the landlord, until applied against defaulted covenants in the lease").

Wachtel asserts that "the security deposit was assigned by Tenant to the Landlord on December 1, 2016 and never replenished." (Wachtel Decl. ¶ 27.) This would have been prior to the Petition Date and the security deposit would therefore not be property of the estate. However, this characterization is based on the following email concerning the "assignment" of the security deposit:

> This is to formally confirm the contents of the e-mail of November 23, 2016 whereby my client has agreed that the security deposit

> amount currently held by you in escrow may be released to the Landlord and temporarily used for the purpose of paying the brokers who brought about their transaction and other immediate operation expenses in connection with the Premises. Upon receipt of rental payments from my client, the security deposit must then be replenished to the amounts set forth in the Lease.

(Wachtel Decl. Ex. A.)

This email alone is insufficient to show that the security deposit was assigned to FTR from the Debtor. Rather, it appears that the Debtor permitted the landlord to access the funds of the security deposit with the understanding that the funds held by the landlord would be replenished in the immediate term with rental payments. A short-term license to use the funds is not an assignment.

As Movants point out, FTR may have pursued setting off its claim (not assigning) with the security deposit without Court permission and instead unilaterally collected the security deposit in violation of the automatic stay after being permitted to do so per the Stipulation. (*Id.*) As a result, the security deposit remains property of the estate and should be included in the Movants' damages.

3. <u>Sculpture</u>

*a. The Sculpture was Likely Property of the Bankruptcy Estate, but Questions Remain Regarding if it was a Fixture*

New York courts have long considered three factors in determining whether an item is a fixture: (1) the degree to which an item has been annexed to real property, (2) whether the item was built for use in specific realty or whether the realty was built specifically to house the item, so that its removal would reduce the value of the realty; and (3) whether the party who annexed the personal property to the realty intended to make it a permanent part of the realty. *Togut v. Nestor (In re Nestor)*, 673 B.R. 67, 78 (Bankr. S.D.N.Y. 2025) (citing cases). However, courts increasingly appreciate the "character of the relevant item and the purpose for which it had been

affixed to the realty." *In re Nestor*, 673 B.R. at 79 (citing *Phipps v. State*, 69 Misc. 295, 297 (Ct. Claims 1910)).

On July 29, 2025, Wachtel sent an email to Morrison, stating "[the] Buddha is deemed a fixture by Landlord, not removeable from the premises." (Weinreb Decl., Ex. 14 at FTR000460.) Morrison replied, "Thank you for letting us know." (*Id.*) However, this email is not dispositive. The appropriate analysis follows:

i. Annexation

Some degree of annexation remains necessary before personal property may be considered a fixture. Originally the concept of "annexation" required that a chattel be "physically attached" to realty, "but that concept has been enlarged to include items that are 'constructively annexed' to the land." *In re Nestor*, 673 B.R. at 80 (citing *In re City of New York (Kaiser Woodcraft Corp.)*, 11 N.Y.3d 353, 360 (2008)). Accordingly, "[a] thing may be as firmly affixed to the land by gravitation as by clamps or cement." *In re Nestor*, 673 B.R. at 80 (citing *Snedeker*, 12 N.Y. at 175 (holding that a large statue and a sundial were fixtures)). The fact that an item has been attached to real property in such a way that its removal would damage the item, or damage the real property, is a relevant factor to be considered in deciding whether the item was intended to be a permanent part of the property and therefore is a fixture. *In re Nestor*, 673 B.R. at 80. However, the fact that an item could be removed without damage to real property is not itself a controlling fact. *Id.* (citing *Voorhees v. McGinnis*, 48 N.Y. 278, 282 (1872)). The permanency of an item's attachment to real property "does not depend so much on the degree of physical force with which the thing is attached as upon the motive and intention of the party in attaching it." *In re Nestor*, 673 B.R. at 81 (citing *McRea v. Cent. Nat. Bank*, 66 N.Y. 489, 495 (1876)). As a result, removability "is not determinative in separating compensable

fixtures from noncompensable personalty." *In re Nestor*, 673 B.R. at 81 (citing *Kaiser Woodcraft Corp.*, 11 N.Y.3d at 359.)

A concrete pedestal was integrated into the floor of the Premises to bear the Sculpture's 25,000-pound weight and anchor it in person. (Vaygensberg Decl. ¶¶ 6-9.) The fabricators joined each individual glass piece to the base or to adjoining pieces with "a structural epoxy compound selected specifically for its permanence." (*Id.* ¶ 6.) It is unclear on the present record if this epoxy compound was solely to ensure the Sculpture did not move on the pedestal akin to nails for a wall painting.

Movants' expert identifies two ways the Sculpture could have been extracted based on assumptions provided to him. Under the first, its head would be "severed from the body using a diamond blade," crated separately, and "re-glued" at the destination. (Motion ¶ 41) (citing Machin Decl. ¶¶ 11-24, 32). Under the second, the Sculpture would be rotated onto its side and "[t]he transom above the front door would . . . have to be temporarily removed to permit clearance." (Motion ¶ 42) (citing Machin Decl. ¶¶ 25-32). Either method, per Mr. Machin, would cost $350,000 to $450,000.

MT asserts that "[a]n object that can be extracted only by dismantling part of the building, or by cutting it apart at a cost exceeding its scheduled value several times over, is not 'movable' in any sense the fixture cases recognize." (MT Objection at 21.) However, the Court concludes based on the record before it that the Sculpture could have been removed without substantial injury to the Premises (at maximum, a door removal).

ii. Adaptability

If an item of personal property has been specially crafted for a particular space, or if the property itself has been specially constructed and/or designed so as to be adapted to the personal

property that has been attached to it, those are factors that suggest that the personal property has been affixed with the intent of becoming a fixture. *In re Nestor*, 673 B.R. at 81(citing *Ward v. Kilpatrick*, 85 N.Y. 413, 419 (1881)).

Here, the Sculpture was built to the specific dimensions of the Premises, with its height and proportion designed around the ceiling height, and its base was sized to match a concrete pedestal poured for that specific location. (Vaygensberg Decl. ¶ 9.) However, as the Sculpture depicts a giant buddha figure, it is not very adaptable for future uses of the space after the Buddha Bar. The subsequent destruction of the Sculpture is evidence of this.

iii. Intent

There must be an intent to make something part of the real property, but "[t]he intent which is regarded as controlling is not the initial intention at the time the chattel is acquired nor the secret or subjective intention of the party making the attachment, but rather the intention which the law will deduce from all the circumstances." *In re Nestor*, 673 B.R. at 81 (citing cases). *Tavern on the Green* is instructive; the court held that a mural was the debtor's personal property because it was "closely connected with [the restaurant proprietor's] persona" and the unique décor of the restaurant. *In re Tavern on the Green*, 2010 WL 148421 at *5. As the mural depicted the proprietor's family and would therefore lack connection to a future use of the space, "it [was] particularly unlikely that there was an intention on [the proprietor's] part to leave it behind[.]" *Id.*

Here, the subject of the Sculpture – a multi-ton buddha – specifically relates to Debtor's restaurant theme and was utilized to promote Buddha Bar's unique brand and business. The destruction of the Sculpture after Debtor's vacatur further evidences its lack of utility or value to the Premises and shows a lack of intent for the Sculpture to remain a permanent fixture. *In re*

*Tavern on the Green*, 2010 WL 148421 at *5. Additionally, in the Stipulation, the Debtor agreed to leave "everything" behind, "including the Buddha," "[i]n consideration of [Debtor's] $2M debt [to FTR]" and in exchange for FTR's release of Stefanov and Vaygensberg's personal guarantees. (*See* Stipulation ¶ 6.) This agreement makes clear that Debtor and FTR recognized the Sculpture as Debtor's personal property which Debtor offered as consideration for the releases in the Stipulation. Lastly, in the bankruptcy schedules filed as part of the initial Petition, the Debtor lists the Sculpture as property of the Debtor. (Motion ¶ 13.)

*b. Sculpture Value*

Movants assert that evidence shows that the Sculpture would have sold for at least $1 million. (Motion ¶ 82.) Movants assume that it would have cost at most $450,000 to move the Sculpture out of the Premises (*see* Machin Decl., ¶ 33), making the net profit to the estate from a sale of the Sculpture approximately $550,000. (Motion at 82.) However, this valuation hinges on the declaration of an expert who was not made available for deposition and cross examination. Unless the matter is resolved by agreement,[2] they will be required to resolve the issue at a further hearing (after discovery if necessary).

**H. Bad Faith**

1. A Finding of Bad Faith is Required for this Court to Impose Sanctions

The Movants are incorrect to argue that the requirement from *Markus*, requiring bad faith to sanction an attorney for acts taken in counsel's role as a client advocate, no longer binds this court subsequent *Windstream Holdings*. In *Windstream Holdings*, the Second Circuit dealt with whether actions taken by a commercial competitor to the debtor violated the automatic stay and

[2] Given that the Debtor's principal has testified that the market value of Buddha would be $1.2-1.8 million and the SBA has valued it at $1 million, the parties should be able to come to an agreement on the appropriate valuation of the Buddha.

warranted sanction. *In re Windstream Holdings, Inc.*, 105 F.4th at 493-94. The Movants are correct that there is no discussion of bad faith in *Windstream Holdings*, but that is because there was no question before the court whether the actions of counsel, in their role as client advocate, warranted sanction. The court in *Markus* made clear that bankruptcy courts have the inherent authority to issue civil contempt sanction, such as in *Windstream Holdings*, without a finding of bad faith. *See In re Markus*, 78 F.4th at 566 (noting that the standard from *King*, 65 F.3d 1051, which does not contain a bad faith requirement, regularly applies to determine if a party is in civil contempt.) The bad faith standard is an additional factor that a court must consider only when the party that civil contempt sanctions are sought after is an attorney whose "misconduct falls within her role as an advocate for her client. . . ." *In re Markus*, 78 F.4th at 566. As such, bad faith is not a requirement for awarding sanctions against the Debtor, Stefanov, or Vaygensberg.

The actions of MT were taken as an advocate. The Movants argue that since the Motion asserts the Non-Moving Parties violated the automatic stay, MT was acting in its role as officer of the court. (Reply ¶ 17; *see also In re Markus*, 78 F.4th at 566.) However, MT's action here is not that they themselves violated the automatic stay, but that MT signed the Stipulation that alienated the personal property of the debtor which was a violation of the automatic stay. This signing of the Stipulation, likely that came about after discussion and negotiation with FTR, was an action MT took as its "role as an advocate" for the Debtor. *In re Markus*, 78 F.4th at 566.

Additionally, signing the Stipulation was an "act of advocacy" to benefit MT's client, the Debtor. Movants claim that there was no benefit to the Debtor since the Stipulation and alienation of the Debtor's personal property harmed the beneficiaries of the estate that both MT and the Debtor owed a fiduciary to. (Reply ¶ 18.) Movants cite to *In re Food Mgmt. Grp.*, LLC,

380 B.R. 677, 707 (Bankr. S.D.N.Y. 2008) where this Court determined that an attorney for a debtor in possession can have a fiduciary duty to the estate. But this Court was clear in cabining that duty as narrower and importantly distinct to the duties an attorney has for its client:

> This Court need not decide the full scope of the [attorney] Defendants' fiduciary duties to the estate. The scope of such duties is certainly narrower than a lawyer's duties to its client. A lawyer owes a duty to a nonclient, and can be held liable for breach, in narrower circumstances.

*Id*. at 709. An attorney's primary duty is to its client. For MT, that was to the Debtor, and it is clear that the Stipulation did benefit the Debtor – it ended the Holdover Proceeding and satisfied the claim from their largest claimant. (*See* Stipulation ¶ 10.) Ultimately MT's misconduct fell within its role as an advocate for the debtor and a finding of bad faith is required for this court to impose sanctions under its inherent powers.

2. Morrison Tennenbaum Acted in Bad Faith

The Movants have sufficiently shown that MT acted in bad faith by signing the Stipulation and knowingly permitting the alienation of the personal property of the Debtor subject to the SBA security interest. MT misleadingly stated in the Stipulation that the Lift Stay Order was not limited to Debtor's eviction, did not inform FTR or its counsel that the property was subject to the SBA lien, and MT failed to seek the approval of this Court. (Motion ¶ 85); *See In re Johns-Manville Corp.*, 26 B.R. 919, 926 (Bankr. S.D.N.Y. 1983) (stating that contempt by attorney and law firm in violating the automatic stay was "far worse because of [counsel's] role as both an officer of the Court and a fiduciary to the estate.") Subsequent to the signing and the entry of the Stipulation in the Holdover Proceeding, MT failed to inform the SBA or the Court that the Stipulation was signed and of its terms. This includes the September 10, 2025 hearing where the SBA appeared to assert its rights as a creditor and MT appeared as Debtor's

counsel. *See In re Reyes*, N, 2023 WL 8184933, at *6 (S.D.N.Y. Nov. 25, 2023) (stating that an attorney's duty of candor requires "more" than "simply not lying; candor is the quality of being open and honest in expression") Only after the personal property of the Debtor was auctioned was the SBA, the Court, and the Trustee made aware of the Stipulation and its terms. This conduct was a brazen disregard of the automatic stay and well beyond "legitimate efforts at zealous advocacy for the client." *In re Markus*, 78 F.4th at 567 (citing *Seltzer*, 227 F.3d at 40.)

The Court will sanction the Debtor, Stefanov, Vaygensberg, and MT, allocating compensatory damages (to be determined) to the SBA to satisfy its secured claim, with the remainder allocated to the Trustee for distribution to unsecured creditors. In addition, the Trustee shall be awarded attorneys' fees, and the United States shall be awarded Machin's expert fees, in amounts to be determined.

## IV. CONCLUSION

For the reasons set forth in this Opinion, the Court **GRANTS** the relief as requested in the Motion as to the civil contempt of the Debtor, Stefanov, Vaygensberg, and MT. The Motion is **DENIED** as to Feng, FTR, and Wachtel. After the case is reassigned, the parties will have to appear before the Court and a new scheduling order will be entered.

**IT IS SO ORDERED.**

Dated: September 22, 2026

*Martin Glenn*

MARTIN GLENN
United States Bankruptcy Judge